STATE OF NORTH CAROLINA v. MICHAEL CORNELIUS WILLIAMS, DEFENDANT

No. COA03-503

(Filed 1 June 2004)

**Evidence— hearsay—reputation of neighborhood for narcotics**

　　The trial court erroneously allowed testimony about the reputation of a neighborhood for drug dealing; evidence of the general reputation of a defendant's home or neighborhood in drug cases constitutes inadmissible hearsay in North Carolina. Moreover, there exists the reasonable possibility of a different result without the improper reputation evidence.

Appeal by defendant from judgment entered 13 September 2002 by Judge John R. Jolly, Jr. in Superior Court, Wake County. Heard in the Court of Appeals 3 February 2004.

STATE v. WILLIAMS

[164 N.C. App. 638 (2004)]

*Attorney General Roy Cooper, by Assistant Attorney General Dahr Joseph Tanoury, for the State.*

*Brian Michael Aus for the defendant-appellant.*

WYNN, Judge.

In North Carolina, the "general rule is that in a criminal prosecution evidence of the reputation of a place or neighborhood is ordinarily inadmissible hearsay." *State v. Weldon,* 314 N.C. 401, 408, 333 S.E.2d 701, 705 (1985). In this case, the trial court erroneously allowed testimony indicating Defendant was in a neighborhood known as an "open air market for drugs." Because we conclude that had this error not been committed, there is a reasonable possibility that a different result would have been reached at trial, we grant Defendant a new trial.

The underlying facts tend to show that on the evening of 19 December 2002, Raleigh Police Officer M.E. Campos and Detective James Hobby along with several Raleigh police officers and detectives executed undercover drug buys in the area surrounding Martin and Freeman Streets in Raleigh, North Carolina. At approximately 10:45 p.m., Officer Campos and Detective Hobby traveled to Freeman Street in an unmarked Ford pick-up truck. According to their testimony, they were immediately approached by a black male wearing a navy blue jacket, blue jeans, tan work boots and a black toboggan with the words "New York" in white on the front. The individual also had "a little bit of a goatee." Officer Campos purchased from this individual what he believed to be a twenty dollar amount of crack cocaine. Subsequent testimony indicated the purported crack cocaine was actually Goody's Headache Powder.

As the officers were leaving Freeman Street, they radioed a description of the individual to other officers in the area for arrest. Shortly thereafter, members of the Raleigh Police Department Selective Enforcement Unit arrived in the Freeman and Martin Street area and began looking for the described individual. As there were several people fitting the description, two individuals were initially detained including Defendant who was detained and searched by Officers Charles Rosa and Christopher Robb. However, after receiving notification the described individual was being detained by other officers, Defendant was released. Approximately five minutes later, Officers Robb and Rosa were notified that they needed to locate Defendant again, as Detective Hobby and Officer Campos indicated

the other individual was not the one who sold them the counterfeit drug. In response, Officers Robb and Rosa went to a house on Freeman Street where they thought the released individual could be located.

At the house, the officers located, detained, frisked and ordered Defendant to place his left hand on the top of his head. As he did this, Officer Rosa noticed Defendant open his hand and drop an item that appeared to be crack cocaine but was later determined to be Goody's Headache Powder. Thereafter, Detective Hobby and Officer Campos identified Defendant as the individual who sold them the purported crack cocaine.

Based upon the State's evidence regarding the alleged sale of the counterfeit drug to Detective Hobby and Officer Campos, a jury acquitted Defendant of the charges for the sale of counterfeit cocaine and the delivery of counterfeit cocaine. However, based upon the State's evidence regarding Defendant's encounter with Officers Rosa and Robb on the porch of the house at Freeman Street, the jury found Defendant guilty of possession with intent to sell counterfeit cocaine and possession with intent to deliver counterfeit cocaine. The jury also found Defendant had attained habitual felon status.

On appeal, Defendant contends the trial court erroneously admitted testimony indicating Defendant was in a neighborhood known as an 'open air market for drugs.' Specifically, Defendant contends the trial court erroneously permitted testimony characterizing the conduct and frequency of drug sales in the residential area surrounding Freeman and Martin Streets in Raleigh, North Carolina. We agree.

Defendant challenges the following testimony from Officer Campos elicited by the prosecution:

Q: And how are street sales done for the most part in Raleigh, particularly in the area around Martin and Freeman Street?

A: Usually groups of folks gather together. They will have one or two crack-heads or crack users.

MR. MANNING: Your Honor, I object.

THE COURT: Overruled. Go ahead.

MS. SHANDLES: Go ahead.

A: Usually street drug dealers will have one or two crack users looking out for the police, and most of them will stand on street

STATE v. WILLIAMS

[164 N.C. App. 638 (2004)]

corners and they look for vehicular traffic driving by and most of the time they try to flag you down. They waive at you with their hands and try to get your attention, try to get you to stop.

MR. MANNING: Motion to strike the answer.

THE COURT: Overruled. Denied.

Officer Campos further testified:

Q: And during the period of time that you have been working in that area [Martin and Freeman Street] the last three years, can you give us an idea of approximately how many drug arrests—cocaine arrests specifically you have made in that area?

MR. MANNING: Objection.

THE COURT: Overruled.

THE WITNESS: I—I have made a number of drug arrests in that area. I couldn't give an exact number, but I have made many arrests in the 700 block, the 800 block, and the 300 block of Freeman Street as well.

Q: BY MS. SHANDLES: Are we talking—

MR. MANNING: Motion to strike the answer.

THE COURT: Denied.

Q: BY MS. SHANDLES: Officer, are we talking in the nature of one or two or ten or twenty or dozens of arrests?

MR. MANNING: Objection.

THE COURT: Overruled.

THE WITNESS: I would say no less than fifteen, twenty arrests just made by compass officers. Usually two or three officers involved.

MR. MANNING: Motion to strike.

THE COURT: Denied.

Q: BY MS. SHANDLES: Have you found that as well as people selling crack cocaine in that area, that people also occasionally sell things as crack cocaine that are not in fact cocaine?

MR. MANNING: Objection.

THE COURT: Wait a minute. I am thinking about that.

MR. MANNING: Motion to strike the answer he just gave.

THE COURT: Well, overruled. Motion to strike denied.

Q: MS. SHANDLES: Now you get to answer.

A: Yes. A lot of times people would sell counterfeit crack cocaine.

MR. MANNING: Motion to strike the answer.

THE COURT: Denied.

Defendant also challenges the following testimony from Detective Hobby:

Q: For how long have you worked in that area [Martin and Freeman Streets]?

A: I rode a beat in that area for approximately a year and a half back when I was on uniformed division and that's a strong period as far as trying to work for drugs. We have—I have probably been on at least three or four searches in that area alone since I have been in drugs and vice.

MR. MANNING: Objection.

THE COURT: It's not responsive, but I will allow it. Overruled at the same time.

In further testimony, Detective Hobby testified:

Q: In your experience have you found that in Raleigh, in the area of Martin and Freeman Street, that not only crack cocaine is sold, but also things that are sold as crack cocaine but turn out not to be?

MR. MANNING: Objection.

THE COURT: Overruled.

THE WITNESS: Yes.

MR. MANNING: Motion to strike the answer.

THE COURT: Denied.

Detective Hobby also testified:

Q: BY MS. SHANDLES: And are you aware of why Martin and Freeman Street has been targeted on those occasions by the police department?

A: Because it is an open air market for drugs.

MR. MANNING: Objection.

THE COURT: Overruled.

THE WITNESS: Numerous complaints from citizens, normal patrols. There is a high percentage of drug arrests made in that area.

Q: BY MS. SHANDLES: Were you working—

MR. MANNING: Objection.

THE COURT: Overruled.

The general rule in North Carolina regarding evidence of the reputation of a home or neighborhood is that such evidence is inadmissible hearsay. *State v. Weldon*, 314 N.C. 401, 333 S.E.2d 701 (1985); *State v. Tessnear*, 265 N.C. 319, 144 S.E.2d 43 (1965); *State v. Crawford*, 104 N.C. App. 591, 598, 410 S.E.2d 499, 503 (1991). In support of its contention that the evidence was admissible, the State relies upon *State v. Stevenson*, 136 N.C. App. 235, 523 S.E.2d 734 (1999). In *Stevenson*, this Court upheld the admission of evidence regarding the reputation of an area known as an area for dealing drugs because the State's theory was the defendant committed robbery in order to buy drugs. This Court stated that "evidence that defendant went to a place known for dealing drugs immediately after the robbery is relevant to show motive." *Stevenson*, 136 N.C. App. at 241, 523 S.E.2d at 737.

However, in *State v. Weldon*, in distinguishing other cases, our Supreme Court rejected the notion that "the reputation of a place is admissible to show the intent or guilty knowledge of one charged with illicit possession of contraband in that place." *Weldon*, 314 N.C. at 410, 333 S.E.2d at 706. In *Weldon*, in reversing this Court's opinion that testimony from a police officer that the defendant's home had a reputation as a place where heroin and other illegal drugs could be bought or sold was admissible, our Supreme Court stated "the applicable general rule is that in a criminal prosecution evidence of the reputation of a place or neighborhood is ordinarily inadmissible hearsay." 314 N.C. at 408, 333 S.E.2d at 705. In rejecting this Court's holding that "evidence concerning the reputation of a place or neighborhood is admissible where it goes to show the intent of the person charged," the Supreme Court stated this Court's reliance upon *State v. Lee*, 51 N.C. App. 344, 276 S.E.2d 501 (1981) was misplaced as *Lee* was based upon improper authority, *State v. Chisenhall*, 106 N.C. 676, 11 S.E. 518 (1890). *Weldon*, 314 N.C. at 408-10, 333 S.E.2d at 705-07.

Rather, our Supreme Court stated the general rule in this State may be found in *State v. Tessnear*, 265 N.C. 319, 144 S.E.2d 43 (1965). In *Tessnear*, our Supreme Court stated that "North Carolina is included among those jurisdictions which hold that evidence of the general reputation of defendant's premises is inadmissible in prosecutions for liquor law violations involving a charge of unlawful sale or possession of intoxicants at particular premises." *Tessnear*, 265 N.C. at 322; 144 S.E.2d at 46. Similarly, evidence of the reputation of Defendant's home or neighborhood in drug cases constitutes inadmissible hearsay. *See State v. Weldon*, 314 N.C. 401, 333 S.E.2d 701 (1985); *State v. Crawford*, 104 N.C. App. 591, 410 S.E.2d 499 (1991); *State v. Harper*, 96 N.C. App. 36, 384 S.E.2d 297 (1989). Accordingly, the trial court erroneously allowed the admission of testimony regarding the reputation of the Freeman and Martin Street area of Raleigh, North Carolina.

As stated in *Crawford*, however, "errors not amounting to constitutional violations do not warrant a new trial unless there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. *See* N.C.G.S. § 15A-1443 (2001). If there is overwhelming evidence of defendant's guilt or an abundance of other evidence to support the State's contention, the erroneous admission of evidence is harmless." *Crawford*, 104 N.C. App. at 598, 410 S.E.2d at 503.

Under N.C. Gen. Stat. § 90-95(a)(2), to obtain a conviction of possession with intent to sell and deliver a counterfeit controlled substance, the State must prove (1) that defendant possessed a counterfeit controlled substance, and (2) that defendant intended to "sell or deliver" the counterfeit controlled substance. N.C. Gen. Stat. § 90-95(a)(2) (2001); *see State v. Creason*, 313 N.C. 122, 129, 326 S.E.2d 24, 28 (1985) (listing the elements of possession with intent to sell or deliver a controlled substance under N.C. Gen. Stat. § 90-95(a)(1)). Our General Statutes define 'counterfeit controlled substance' as:

Any substance which is by any means intentionally represented as a controlled substance. It is evidence that the substance has been intentionally misrepresented as a controlled substance if the following factors are established:

1. The substance was packaged or delivered in a manner normally used for the illegal delivery of controlled substances.

STATE v. WILLIAMS

[164 N.C. App. 638 (2004)]

2. Money or other valuable property has been exchanged or requested for the substance, and the amount of that consideration was substantially in excess of the reasonable value of the substance.

3. The physical appearance of the tablets, capsules or other finished product containing the substance is substantially identical to a specified controlled substance.

N.C. Gen. Stat. § 90-87(6)(b) (2001).

In this case, Defendant was charged with crimes arising from two separate events—(1) the sale and delivery of counterfeit crack cocaine to Detective Hobby and Officer Campos for $20.00 and (2) possession with intent to sell and possession with intent to deliver counterfeit crack cocaine based upon a search conducted by Officers Robb and Rosa of Defendant's person at a house located on Freeman Street. The jury acquitted Defendant of the sale and delivery of counterfeit crack cocaine to Officer Campos and Detective Hobby.

"A verdict may be given significance and a proper interpretation by reference to the indictment, the evidence, and the instructions of the court." *State v. Hampton*, 294 N.C. 242, 248, 239 S.E.2d 835, 839 (1978); *see also State v. Whitley*, 208 N.C. 661, 664, 182 S.E. 338, 340 (1935) (stating "it is the rule with us, both in civil and criminal actions, that a verdict may be given significance and correctly interpreted by reference to the pleadings, the facts in evidence, admissions of the parties, and the charge of the court"); *State v. Hemphill*, 273 N.C. 388, 390, 160 S.E.2d 53, 55 (1968) (stating "a verdict must be responsive to the issue or issues submitted by the court").

In the present case, the trial court instructed the jury on the sale and delivery of counterfeit crack cocaine as follows:

In Count Three, the defendant has been charged with selling a counterfeit controlled substance. As to this count, I instruct you that you may determine defendant's guilt or innocence as to this Count Three *only as it relates to the alleged sale of the substance identified as State's Exhibit 1. The State offered no evidence that defendant sold the substance identified as State's Exhibit 1A and you should not consider such exhibit in relation to this Count Three.*

In this regard, for you to find the defendant guilty of this offense, the State must prove two things to you beyond a reasonable doubt.

First, that the defendant *knowingly sold counterfeit crack cocaine to Officer M.E. Campos of the Raleigh Police Department, representing it to be crack cocaine, a controlled substance.*

Second, that the substance sold was a counterfeit controlled substance. . . .

So, I charge you as to this Count Three that if you find from the evidence beyond a reasonable doubt that on or about the alleged date the *defendant knowingly sold counterfeit crack cocaine to Officer M.E. Campos of the Raleigh Police Department, representing it to be crack cocaine, a controlled substance, and that the substance sold was a counterfeit controlled substance, it would be your duty to return a verdict of guilty as to this Count Three.*

. . .

*If you do* not so find, or if you have a reasonable doubt as to one or more of these things, it would then be your duty to return a verdict of not guilty of this Count Three.

The trial court rendered similar instructions as to Count Four of the indictment, the delivery of counterfeit crack cocaine. In both instructions, the trial court limited the jury's deliberations of these counts to the alleged sale of counterfeit crack cocaine to Officer Campos by Defendant. Thereafter, the jury rejected the State's evidence that Defendant sold and delivered counterfeit crack cocaine to Officer Campos and returned verdicts of not guilty on those charges.

Thus, in light of the trial court's instructions limiting the consideration of the evidence of the alleged sale and delivery of a counterfeit substance to Officer Campos, the jury's verdict of not guilty of the sale and delivery of a counterfeit substance to Officer Campos, and in the absence of the erroneously admitted reputation evidence, the remaining evidence tended to show that: Officers Rosa and Robb initially detained Defendant while other officers detained another individual. The officers frisked Defendant for weapons and conducted a pat-down but found neither weapons nor drug—real or counterfeit. After hearing they had detained the wrong individual, the officers released Defendant and watched him walk to a house on Freeman Street. Shortly thereafter, Officers Robb and Rosa were notified that a mistake had been made and they needed to locate the individual they had initially detained and released. The officers went to the house where they had seen Defendant go and found Defendant

**STATE v. WILLIAMS**

[164 N.C. App. 638 (2004)]

sitting in a chair on the front porch conversing with a group of five to six people.

After removing Defendant from the porch, Officer Robb, who was standing behind Defendant, began searching him. As Defendant raised his left hand towards the top of his head, Officer Rosa saw Defendant drop something from his left hand and land two feet behind him. Officer Robb did not see anything drop from Defendant's hand. Upon the arrival of Detective Hobby and Officer Campos for the show-up, Officer Rosa handed the contraband to Officer Campos and indicated the item was part of his case.

Although the alleged contraband looked like crack cocaine, it was counterfeit—i.e., Goody's Headache Powder. After initially characterizing this item as a "dosage unit," Officer Campos later testified that this item was known as a $50 flip, "which is a rock that you buy on the streets for $50 and you cut it up and you make five pieces out of it and you go back out in the street and you sell each piece for $20 and you make $100 out of it. That's why it's called a $50 flip because you double your profit." However, this particular "rock" was not broken into smaller units for sale. Officer Rosa further testified the counterfeit cocaine was packaged in a clear torn piece of a plastic baggy. He testified that "if they are purchasing [crack cocaine], it's usually not packaged and it's been taken out of a package. But if they are carrying it, it's either in plastic, clear plastic."

We hold that under this evidence, there is a reasonable possibility that, had the erroneous reputation evidence not been admitted, the jury would have reached a different result at trial. Indeed, the evidence tends to show only that defendant possessed an unbroken dosage unit of a counterfeit substance while sitting on the front porch of a house socializing with five to six people. A jury could therefore conclude that Defendant merely possessed a substance with the appearance of a counterfeit controlled substance. In that instance, North Carolina law would require acquittal because the mere possession of a *counterfeit* controlled substance is not a crime. *See* N.C. Gen. Stat. § 90-95(a) (2001).[1] Accordingly, we conclude admission of

---

1. N.C. Gen. Stat. § 90-95(a) (2001) states:

    (a) Except as authorized by this Article, it is unlawful for any person:

        (1) To manufacture, sell or deliver, or possess with intent to manufacture, sell or deliver, a controlled substance;

        (2) To create, sell or deliver, or possess with intent to sell or deliver, a counterfeit controlled substance;

        (3) To possess a controlled substance.

**N.C. STATE BAR v. ROGERS**

[164 N.C. App. 648 (2004)]

the neighborhood's reputation was not harmless error as there was not overwhelming evidence of defendant's guilt.

New trial.

Judges McGEE and TYSON concur.